**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA　　　　:

　　　v.　　　　　　　　　　:　　　　No. 25-cr-341 (AHA)

GERALD EZELL　　　　　　　:

### DEFENDANT'S SENTENCING MEMORANDUM

Mr. Gerald Ezell is a 36-year-old man who has faced tremendous challenges in his life.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████

But Mr. Ezell is not his mistakes.  The period that preceded the instant offense marked

Mr. Ezell's longest period without involvement in the criminal justice system—from May 2018

until September 2025.  He had successfully completed supervision in his May 2018 case[1] without

any violations, and from 2020 to 2022 was his invalid grandmother's sole caregiver—███████

███████████████████████████████████████████████

---

1 The case was not charged in DC Superior Court until 2019, but it arose from conduct in May 2018.  *See* PSR
¶ 36.

███████████████ And, in the run up to the instant offense, while Mr. Ezell was homeless and living in his vehicle, he made sure to park it near his great aunt's home so he could take care of her in her old age as well.

Mr. Ezell deeply regrets his conduct in this case ████████████████████ ██████████████████████████████████████.

A sentence of 17 months is appropriate for Mr. Ezell's non-violent offense of possession of a firearm by a felon pursuant to § 922(g)(1).

**Argument**

When imposing a sentence, the Court must consider several factors, including the Guidelines; the history and characteristics of the defendant; the nature and circumstances of the offense; the need to avoid unwarranted disparities; the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence to criminal conduct; and the kinds of sentences available. *See* 18 U.S.C. § 3553(a); *United States v. Booker*, 543 U.S. 220, 259 (2005). These factors and the unique circumstances of this case demonstrate that a term of incarceration of 17 months is sufficient but not greater than necessary. *See* 18 U.S.C. § 3553(a) (court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with the purposes [of sentencing]" (emphasis added)); *see also* U.S.S.G. § 5C1.1., Appl. Note 4 (Nov. 1, 2023) (citing 28 U.S.C. § 994(j) ("The Commission shall insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense . . .")).

**I. The United States Sentencing Guidelines**

### A.     Mr. Ezell's Guidelines Range is 57 to 71 Months

All parties agree that Mr. Ezell's guideline range is 57 to 71 months.   This consists of a base offense level of 20 pursuant to USSG § 2K2.1(a)(4)(B) because the firearm had a large capacity magazine and Mr. Ezell was a prohibited person; a four level increase for possessing the firearm in connection with a felony offense pursuant to § 2K2.1(b)(7)(B); a three-level decrease for acceptance of responsibility pursuant to § 3E1.1(a); and criminal history category IV.

### B.     A Variance is Warranted Because the Guidelines Overstate the Seriousness of Mr. Ezell's Offense

Mr. Ezell, as just noted, agrees with the Guidelines calculation.   However, it overstates the seriousness of the offense. Typically, the four-level increase pursuant to § 2K2.1(b)(7)(B), applies in cases involving drug trafficking offenses, like possession with intent to distribute. However, here, Mr. Ezell—who suffers from substance use disorder—possessed the cocaine for personal use.[2]

The traditional indicia of drug dealing are absent here.   The quantity of drugs is not large— only 4.62 grams of cocaine hydrocholoride.   The quantity of cash seized—$97 dollars—is not indicative of drug dealing.   The black scale law enforcement found is not a larger dealer's scale. Instead, it is consistent with the small scales users sometimes possess to weigh their drugs.   The government also found small, colorful, plastic containers that could be used for just about anything. The defense does not dispute that those containers can and are used to distribute drugs on some occasions.   But the government has not put forth evidence that they were being so used by Mr. Ezell at the time.   Mr. Ezell was homeless and living in his vehicle at the time of the offense, and

---

[2] Simple drug possession is a felony offense under federal law if it is the offender's second offense.   Mr. Ezell does not dispute that he possessed the firearm in connection with that felony.

did not even recall that he had those containers.   Finally, Mr. Ezell is a drug addict and user, and body worn camera footage from that reveals that he was obviously high on the night in question— further underscoring that the drugs were for his own use.

In *United States v. Gaines*, 25-cr-39-AHA, this Court was recently confronted with a similar situation.   In that case, the government had seized a firearm and 7.67 grams of cocaine. Dkt. 79, 25-cr-39-AHA.   Law enforcement also recovered a scale with white residue and three "zips" of cocaine.   *Id.*   The Court nevertheless declined to follow probation's recommended four-level enhancement and instead, agreeing with defense counsel and the government in that case, concluded it did not apply.   If the four-level enhancement did not apply at all in *Gaines*, then a variance is appropriate here given that Mr. Ezell possessed the cocaine for personal use and not the usual—and substantially more dangerous—offense of drug trafficking.

### C. A Variance is Warranted Because U.S.S.G. § 2K2.1 Does Not Embody § 3553(a) Considerations or Result in Sentences That Might Achieve § 3553(a)'s Objectives.

When the Guidelines were first promulgated in 1987, to create a guideline for unlawful firearm possession, the Sentencing Commission attempted to "synthesiz[e] a coherent rationale that generally explain[ed] and [was] reasonably consistent with current sentencing practice." USSC, Supplementary Report on The Initial Sentencing Guidelines and Policy Statements, 18 (1987).   The Commission acknowledged that there were not enough statistically-significant patterns for sentencing prohibited firearm possession to create a clear guideline, noting that its "detailed statistical analyses . . . were of little value in explaining or rationalizing current sentences."   *Id*.   Although the Commission found that pre-Guidelines sentences had statistically-irrelevant ranges likely because of "the wide variety of circumstances under which these offenses occur," the Commission found that the "actual or intended use of the firearm was probably the

4

most important factor in determining the sentence." U.S.S.G. § 2K2.1, cmt. background (1987). The Commission created guideline § 2K2.1 with a base level of 9 points, reduced to 5 if the firearm was possessed for lawful sporting use, or enhanced if the firearm was used in another offense. *See* U.S.S.G. § 2K2.1(a) (1987). Today, because of amendments made in 1991, a defendant's actual or intended use of the firearm plays no role in determining the Guideline range. Instead, prior criminal history and type of weapon are largely determinative.

In 1989, the Commission increased the base offense level by 3 points, from 9 to 12, U.S.S.G. § 2K2.1(a) (1989), to reflect an increase in the statutory maximum penalty for unlawful firearm possession, which Congress doubled from 5 to 10 years in the Anti-Drug Abuse Act of 1988, *see* U.S.S.G. app. C, amend. 189, 100-101 (1989).

Then, in 1991, against the weight of empirical evidence collected from 1987 to 1990, the Commission completely erased and replaced the firearms guidelines. Similar to the now-discredited drug guidelines, the Commission dramatically increased the penalties proscribed under § 2K2.1 "in light of the Congressional sanction of a minimum 15 years for a prohibited person with three prior felonies of violence or controlled substance offenses." 1990 Commission Report 19. To create a framework "proportional" to the ACCA, the Commission doubled the base offense level for a defendant with two prior crimes of violence or controlled substance offenses, from 12 to 24, effectively increasing the penalties prescribed for such defendants six-fold. *See id.* at 19-23.

The Commission did not "conduct[] any meaningful and complete review" of the approximately 1,500 cases that had applied the more lenient § 2K2.1 guidelines in 1987, instead reviewing merely 64 cases that had applied § 2K2.1 in 1989. *Id.* at 8-9 & nn. 29-30. The

5

Commission disregarded findings that, in 1989, in 72% of cases where possession of the firearm was for *personal protection*, sporting, or collection purposes, defendants were sentenced at or below the lower end of the guideline range and received an average sentence of 11 months. *Id*. at 10 n. 33. The Commission also did not point to any specific evidence of any need for the dramatic increase in penalties for firearms offenses.

Instead, like the now-discredited, overinflated drug guidelines, the firearms guidelines are severe "not because [the Commission] necessarily thought that those levels were most in keeping with past sentencing practice or would independently have reflected a fair set of sentences, but rather because the Commission believed that doing so was the best way to keep similar [firearm] sentences proportional" to the ACCA. *Dorsey v. United States*, 567 U.S. 260, 268 (2012).

Because the Commission ignored "empirical data and national experience" in creating the firearms guideline, the § 2K2.1 provisions "do not exemplify the Commission's exercise of its characteristic institutional role" or "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough*, 552 U.S. at 109 (internal quotation marks and citations omitted); *see also Gall*, 552 U.S. at 46 & n. 2.

Instead, as demonstrated in this case, the Guidelines drastically overstate the seriousness of the offense by ignoring relevant considerations.

### D. A Variance is Warranted Because the Base Offense Level of 20 was Promulgated Contrary to Empirical Data and National Experience

The Violent Crime Control and Law Enforcement Act of 1994 (the Act), *inter alia*, created a new offense at 18 U.S.C. § 922(v) criminalizing the manufacture, transfer or possession of a "semiautomatic assault weapon" listed in 18 U.S.C. § 921(a)(30), and a new offense at 18 U.S.C. § 922(w) criminalizing the transfer or possession of a "large capacity ammunition feeding device,"

defined as capable of accepting more than ten rounds, both subject to a five-year maximum under 18 U.S.C. § 924(a)(1)(B).   Pub. L. No. 103-322, §§ 110102, 110103, 108 Stat. 1796, 1996-99 (Sept. 13, 1994).   The Act exempted from the ban large capacity magazines that had been manufactured on or before the effective date of the Act.   At that time, there were approximately 25 million pre-ban large capacity magazines in the United States and another 4.7 million pre-ban large-capacity magazines were imported between 1995 and 2000.[3]

The Act directed the Sentencing Commission to "provide an appropriate enhancement" for a crime of violence or a drug trafficking crime "if a semiautomatic firearm is involved."   Pub. L. No. 103-322, § 110501, 108 Stat. 1796, 2015 (Sept. 13, 1994).   The Commission implemented the directive through an upward departure, § 5K2.17, p.s., for semiautomatic firearms with a magazine capacity of more than ten cartridges possessed in connection with a crime of violence or controlled substance offense.   *See* U.S.S.G., App. C., amend. 531 (Nov. 1, 1995) ("This amendment addresses the directive in section 110501 of the Violent Crime Control and Law Enforcement Act of 1994 to provide an appropriate enhancement for a crime of violence or a drug trafficking crime if a semiautomatic firearm is involved.").

Nonetheless, in 2006, the Commission voted to retain the enhanced base offense levels in § 2K2.1(a)(1), (3) and (4); to broaden their reach from the specific list in former 18 U.S.C. § 921(a)(30) to any "semiautomatic firearm that is capable of accepting a large capacity magazine," *i.e.*, one with a magazine capable of accepting more than 15 rounds attached or in close

---

[3] Christopher S. Koper, *Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence*, 1994-2003, Report to the National Institute of Justice, U.S. Dept. of Justice (June 2004), available at http://www.ncjrs.gov/pdffiles1/nij/grants/204431.pdf.

proximity, U.S.S.G. § 2K2.1, comment. (n.2); and to amend the definition in §5K2.17, p.s., to require more than 15 rounds.   The only reason the Commission gave for retaining and expanding the enhanced base offense levels was that it had "received information regarding inconsistent application as to whether the enhanced base offense levels apply . . . in light of the ban's expiration."   U.S.S.G., App. C., amend. 691 (Nov. 1, 2006).   The Department of Justice recommended that the Commission use the upward departure only and *not* the enhanced base offense levels "in light of the fact that possession of such firearms are no longer illegal *per se*."[4]

The Federal Defenders provided extensive comment demonstrating that the increased base offense levels were contrary to empirical evidence, contrary to congressional intent, and would include ordinary firearms with legitimate uses and little risk of unlawful violence.[5]   The Commission never considered whether the increased base offense levels should apply at all in light of the repeal of the ban and the empirical evidence, instead seizing on the vague assertion of the Probation Officers' Advisory Group that "courts are handling this issue in a variety of manners, whether applying it and granting a downward departure and/or variance, or not applying it and giving an upward departure and/or variance, resulting in disparity in sentences imposed nationally."[6]   The Commission cited no data confirming that this assertion was accurate, and did not explain why it had any bearing on achieving the purposes of sentencing.

Indeed, there is no rationale grounded in empirical research or sentencing purposes for

---

[4]    DOJ Written Testimony at 11 (March 15, 2006), htttp://www.ussc.gov/hearings/03_15_06/Richard-Hertling.PDF.
[5]    Defenders Written Testimony at 2-10 (March 9, 2006), http://www.ussc.gov/hearings/03_15_06/rhodestestimony.pdf.
[6]    POAG Written Testimony at 3 (March 15, 2006), http://www.ussc.gov/hearings/03_15_06/Battistellitestimony.pdf.

punishing possession of large-capacity magazines so severely.  Large capacity magazines are legal to buy, sell and trade federally.

The fact that the assault weapons ban was allowed to expire in 2004 indicates a societal judgment that large capacity magazines should not be outlawed.  Despite that, the Commission chose to retain increased punishment not only for possession of firearms with magazines covered by the repealed ban, but for possession of firearms with magazines that were not covered by the ban even when it was in effect.  *See also* Cato Institute Report, Losing Count: The Empty Case for "High-Capacity" Magazine Restrictions, July 17, 2018, (Three main problems with high capacity magazine restrictions: (1) the term "high-capacity" is used by legislatures to describe standard, common equipment rather than magazines that stretch a weapon's capacity beyond its intended design; (2) discussions of the issue are replete with fundamental misconceptions about firearm magazines and their place under the Second Amendment; and (3) there is little evidence that high-capacity magazine restrictions have any positive effects on public safety.).

### E. A Variance is Warranted Because Relying on Criminal History in Sentencing is Not Justified by Theories of Punishment and Has a Racially Disparate Impact.

Scholars recognize that "[i]t is difficult . . . to find a principled justification for increasing the severity of punishment because of an individual's criminal history" and that "criminal history is entangled with racial bias and foreseeable disparate racial effects."  Michael Tonry, *Predictions of Dangerousness in Sentencing: Déjà Vu All Over Again*, 48 Crime & Justice 439, 461 (2019).

Consequently, the Model Penal Code: Sentencing warns against the use of criminal history in sentencing.  It cautions against using criminal history "for purposes of assessing offenders' blameworthiness for their current offenses" because "offenders have already been punished for their prior convictions."  American Law Institute, *Model Penal Code: Sentencing, Proposed Final*

*Draft* § 6B.07(1) (Apr. 10, 2017), available at https://robinainstitute.umn.edu/

sites/robinainstitute.umn.edu/files/2022-02/mpcs_proposed_final_draft.pdf.    It cautions against

using criminal history "for purposes of assessing an offender's risk of reoffending" because "the

use of criminal history by itself may over-predict those risks."   *Id*.   Moreover, it cautions against

using criminal history because of "the danger that the use of criminal-history provisions to increase

the severity of sentences may have disparate impacts on racial or ethnic minorities, or other

disadvantaged groups."    *Id*.    With respect to the last, the commentary explains, "[a]n

accumulating body of research indicates that criminal-history formulas in sentencing guidelines

are responsible for much of the 'unexplained' disparities in black and white incarceration rates—

that is, disparities cannot be 'accounted for' by differential rates of crime commission, arrest, and

conviction."   *Id*. § 6B.07 cmt. c(3).

"Racial differences in criminal history are a primary cause of racial disparities in

imprisonment."   Tonry, 48 Crime & Justice 439, 458.   Studies have shown that "criminal history

factors disproportionately affect blacks" because they are "arrested at younger ages and more often

than white people for reasons that have as much to do with racially differentiated exercises of

police discretion as with racial differences in offending behavior."   *Id*. at 462-63.   Police

practices, including racial profiling and police targeting of poor and minority neighborhoods and

individuals, inflate the criminal records of minority individuals compared with other people.   *Id*.

In addition, "[b]lacks are much more likely than whites to be mislabeled as dangerous and, if this

is reflected in sentencing, to be punished more severely than they otherwise would be."   *Id*. at

458; *see also* Michael Tonry, *Fifty Years of American Sentencing Reform: Nine Lessons*, 48 Crime

& Justice 1, 15 (2019).   Considering criminal history includes considering an individual's arrest

10

record.    The same racial differences are present due to the racial disparities in arrests.

Lastly, "it is imperative that the sentencing system do nothing to exacerbate preexisting racial disparities arising from life conditions in segregated and disadvantaged communities, or disparities introduced in earlier stages of the criminal justice process." American Law Institute, *Model Penal Code: Sentencing, Proposed Final Draft* § 6B.07 cmt. c(3).    Here, it is clear that a Guidelines sentence would do just that.

## II. Imposing a Sentence of 17 Months is Sufficient, But Not Greater Than Necessary, to Comply with § 3553(a).

The primary directive in § 3553(a) is that the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with" the purposes of sentencing. *See* 18 U.S.C. § 3553(a) (emphasis added). Honest application of that statute confirms that a sentence of 17 months is sufficient but not greater than necessary to meet the goals of sentencing.

### A. Mr. Ezell's History and Characteristics

Like the other sentencing factors under 18 U.S.C. § 3553(e), Mr. Ezell's history and characteristics support a sentence that includes no more than 17 months of incarceration.

a.





## B.  The Nature and Circumstances of the Offense

On September 21, 2025, law enforcement attempted to conduct a traffic stop on Mr. Ezell's parked vehicle.  He was inside the vehicle at the time, and a Glock 19 pistol and 4.62 grams of cocaine were recovered from the vehicle, along with a black scale, and multiple, unused plastic containers.

Mr. Ezell deeply regrets his actions in this case, recognizes he is far too old to continue making the same mistakes he made earlier in his youth, ███████████████████████████ ████████████████████████████████████████████████ However, Possession of a firearm is not a violent offense, as a matter of fact or law, as "[n]either the act of possessing a weapon nor the fact of being a felon is in itself a crime of violence." *United States v. Gloster*, 969 F. Supp. 92, 98 (D.D.C. 1997). And there are no allegations that Mr. Ezell ever used the firearm here to commit any acts of violence. Therefore, the nature and circumstance of the offense simply do not require a sentence greater than 17 months.

### C. Unwarranted Disparities

When determining an appropriate sentence, the Court must avoid unwarranted disparities by considering the sentences imposed in similar cases. *See* 18 U.S.C. §3553(a)(6). This factor supports a sentence of 17 months as well.

Perhaps the most analogous case for Mr. Ezell is this court's recent sentencing in *United States v. Gaines*, 25-cr-39 (AHA). In that case, like here, the defendant was arrested and charged with being a felon in possession of a 9mm handgun with an extended magazine. Like here, as noted above, the government seized cocaine and a scale with what appeared to be cocaine residue at the time of the defendant's arrest. Dkt. 79 at 2, 25-cr-39 (AHA). Probation calculated a guidelines range of 46-57 months, including the imposition of enhancements for both reckless endangerment in flight and possessing the firearm in connection with a felony offense. *Id.* The Court ultimately disagreed with the imposition of the in-connection-with-a-felony enhancement, but did agree with the reckless endangerment enhancement, and, after a variance, imposed a 17-month sentence.

Here, the case for an equivalent sentence is straightforward.   Mr. Ezell had less cocaine—4.62 instead of 7.67 grams.   That cocaine, unlike in Mr. Gaines case, was not mixed with a fentanyl, a drug that is 50 times more potent than heroin as an analgesic.   *See* Dkt. 74 at 9, 25-cr-39 (AHA).   Unlike Mr. Gaines, Mr. Ezell did not flee with gun in hand, and toss it while running. *Id.* at 5.   Indeed, while Mr. Ezell's firearm had a single bullet in the chamber, it had no magazine inside it at the time it was found.[14]   In addition, though Mr. Ezell has a longer criminal record than Mr. Gaines did, his record reflects genuine progress.   As a younger man, Mr. Ezell was frequently in trouble.   But Mr. Ezell's last offense prior to this one was committed in May of 2018—over six years ago and more than five years before the instant offense.   PSR ¶ 36. Mr. Ezell is an older and wiser man than he was during his earlier criminal activity, and is adamant that he no longer wants to participate in the street life that characterized his youth.   In Mr. Gaines's case, by contrast, the defendant had finished supervision for a previous firearm offense just six months prior. Dkt. 74 at 7, 25-cr-39 (AHA).   Mr. Ezell, for his part, had been off supervision for years. *See* PSR ¶ 36 (probation completed satisfactorily in January 2021).   ██████████

████████████████████████████████████████████████  ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[14] The magazine was located outside the firearm, next to it.

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████ d.

Or compare this case to the case of *United States v. Little*, 25-cr-286 (AHA).   In that case, Mr. Little was arrested with a Glock handgun, $700 dollars, 168 Oxycodone Pills, 3.6 ounces of individually packaged marijuana, and two other drugs.   Dkt. 24, 25-cr-286 (AHA).   The defendant had a more substantial criminal history than Mr. Ezell, landing him in criminal history category V, and the defendant's resulting Guidelines were 70-87 months.   *Id.*   Mr. Little also had a troubled upbringing.   He was raised in a two-parent household—but one that was plagued by drug and alcohol abuse and a lack of adequate food.   His father also physically abused his mother. This Court ultimately sentenced Mr. Little to 30 months, to run concurrent with his sentence of 8 months in Superior Court.   In other words, this Court effectively gave Mr. Little a 22-month sentence, or a sentence that is approximately 31% of the bottom of his Guidelines range.

Mr. Ezell, as noted, had nowhere near the cash like that on his person, nor the volume of different kinds of drugs that Mr. Little did.   His Guideline range is also lower—57-71 months.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████.   To borrow the math from *Little*, 31% of the bottom of Mr. Ezell's Guidelines range is between 17 and 18 months.   This, too, supports Mr. Ezell's request of a 17 month sentence.

This Court, of course, is not the only one to give substantial below Guideline sentences. In *United States v. Van Dyke, Jr.*, No. 19-cr-344 (JEB), the Court varied downward and sentenced the defendant to time-served (approximately 5 days incarceration) in a § 922(g) case where the guideline range was 37 to 46 months.   While all cases are unique, the 17-month sentence in this case would be far more significant, and Mr. Ezell's pretrial incarceration did not afford him the opportunity to demonstrate his commitment to rehabilitation to the Court prior to sentencing.   In *United States v. Jumal Carroll*, No. 19-cr-407 (ABJ), the defendant was sentenced to 18 months, where the guideline range was 30-37 months, concurrent to an expected nine-month sentence for violation of supervised release.   And in *United States v. Christopher Carroll*, No. 20-cr-16 (JEB), the Court also varied downward and sentenced the defendant to one year and one day where the guideline range was 30 to 37 months.   In another case involving a guideline range of 30 to 37 months, the Court imposed a sentence of 14 months.   *See United States v. Antone Watkins*, No. 20-cr-19 (CRC).

To avoid unwarranted disparities, a sentence of 17 months is appropriate in Mr. Ezell's case.

### D. The Requested Sentence Would Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.

18 U.S.C. § 3553(a)(2)(A) provides that the Court must assess "the need for the sentence imposed— . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."   A lengthy term of incarceration is not required in order for a sentence to reflect the seriousness of the offense.   Even a sentence of probation "rather than incarceration can work to promote the sentencing goal of respect for the law by illustrating a rejection of the view that the law is merely a means to dispense harsh punishment without taking

into account the real conduct and circumstances involved in sentencing." *United States v. Bennett*, No. 8:07CR235, 2008 U.S. Dist. LEXIS 45302, at \*12 (D. Neb. May 30, 2008) (citing *Gall*, 552 U.S. at 99).

### E. The Requested Sentence Would Provide Adequate Deterrence to Criminal Conduct and Protect the Public from Further Crimes

Under 18 U.S.C. §§ 3553(a)(2)(B) and (a)(2)(C), this Court must also consider "the need for the sentence imposed—. . . to afford adequate deterrence to criminal conduct...[and] to protect the public from further crimes of the defendant."   The public has been protected while Mr. Ezell has been incarcerated.   It will be protected by his continued incarceration until the conclusion of an 18 month sentence.   And the public will be protected while Mr. Ezell is being supervised by the Probation Officer on release, which will further deter criminal conduct.   Lengthy prison sentences do not mean the public is safe.   A 2017 Vera Institute of Justice analysis shows that higher incarceration has diminishing returns for society:

> It may seem intuitive that increasing incarceration would further reduce crime: incarceration not only prevents future crimes by taking people who commit crime "out of circulation" (incapacitation), but it also may dissuade people from committing future crimes out of fear of punishment (deterrence).   **In reality, however, increasing incarceration rates has a minimal impact on reducing crime and entails significant costs**….[15]

While "[p]rison is an important option for incapacitating and punishing those who commit crimes," evidence suggests that lengthy prison sentences do not have a "chastening" effect and

---

[15] Don Stemen, *The Prison Paradox: More Incarceration Will Not Make Us Safer*, July 2017, The Vera Institute of Justice, Vera Evidence Brief, https://www.vera.org/downloads/publications/for-the-record-prison-paradox_02.pdf (last accessed on Sept. 29, 2021) (emphasis added); *see also* Marc Mauer, *Long-Term Sentences: Time to Reconsider the Scale of Punishment*, Nov. 5, 2018, The Sentencing Project, available at https://www.sentencingproject.org/publications/long-term-sentences-time-reconsider-scale-punishment/ (last accessed on Sept. 29, 2021) ("There is also strong criminological evidence that lengthy prison terms are counterproductive for public safety as they result in incarceration of individuals long past the time that they have 'aged out' of the high crime years, thereby diverting resources from more promising crime reduction initiatives.").

24

"produce at best a very modest deterrent effect."[16]   With respect to specific deterrence, research shows conclusively that "[t]he *certainty* of being caught is a vastly more powerful deterrent than the punishment," that "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime," and that "[i]ncreasing the severity of punishment does little to deter crime." *Id.* (emphasis in original); *see also* James Austin *et al.*, *How Many Americans Are Unnecessarily Incarcerated?*, Brennan Ctr. For Just., N.Y. Univ. School of Law, 22 (2016) (quoting a 2011 study by criminologists concluding that "across all offenders, prisons do not have a specific deterrent effect.   Custodial sentences [jail and prison] do not reduce recidivism more than noncustodial sanctions.").   A lengthy sentence is not needed to deter criminal conduct in this case.   Instead, a sentence of 17 months is adequate.

## Conclusion

The circumstances of this case and other sentencing factors support a sentence to a term of 17 months.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/

_____
COURTNEY L. MILLIAN
Assistant Federal Public Defender
625 Indiana Avenue, N.W.
Suite 550
Washington, D.C. 20004
(202) 208-7500

---

[16] *Five Things About Deterrence*, Nat'l Inst. Justice, U.S. Dep't of Justice, 1-2 (May 2016).